**UNITED STATES of America**

v.

**Harvey O'CONNOR.**

**Cr. No. 1650-53.**

United States District Court
District of Columbia.

Nov. 15, 1955.

**592**

Leo A. Rover, U. S. Atty., William Hitz, Asst. U. S. Atty., Washington, D. C., for the Government.

Gerhard P. Van Arkel and Leonard Boudin, New York City, for defendant.

McGARRAGHY, District Judge.

The defendant was indicted and tried on a charge of violation of Title 2, United States Code, § 192, in which it was alleged that, when appearing as a witness before the Senate Permanent Subcommittee on Investigations of the Committee on Government Operations, the defendant "unlawfully refused to answer a question put to him by the Subcommittee * * *." At the close of the Government's case, the defendant made a motion for a judgment of acquittal which was renewed at the close of the entire case and was based upon the following grounds:

One—The indictment fails to state a cause of action.

Two—The evidence shows the Committee did not have jurisdiction over the subject which the Subcommittee was investigating.

Three—The question propounded was not pertinent to the subject under inquiry.

Four—The question invaded the defendant's rights under the First Amendment to the Constitution.

### Point One.

Defendant claims the indictment is defective for four reasons. (1) "The indictment fails to set forth the essential elements necessary to charge a crime under 2 U.S.C. 192 * * *" in that "it fails to allege that the refusal to answer was 'wilful'." Defendant relies on Quinn v. United States, 349 U.S. 155, 165, 75 S.Ct. 668, 674, which held that "a deliberate, intentional refusal to answer * * * must be proved beyond a reasonable doubt." However, this refers to matters of proof at trial, and not to allegations in the indictment. In considering the element of wilfulness, the Court said:

"Clearly not every refusal to answer a question propounded by a congressional committee subjects a witness to prosecution under § 192. Thus if he raises an objection to a certain question—for example, lack of pertinency or the privilege against self-incrimination—the committee may sustain the objection and abandon the question, even though the objection might actually be without merit. In such an instance, the witness' refusal to answer is not contumacious, for there is lacking the requisite criminal intent. Or the committee may disallow the objection and thus give the witness the choice of answering it or not. Given such a choice, the witness may recede from his position and answer the question. And if he does not then answer, it may fairly be said that the foundation has been laid for a finding of criminal intent to violate § 192. In short, unless the witness is clearly apprised that the committee demands his answer notwithstanding his objections, there can be no conviction under § 192 for refusal to answer that question."

There is no contention in the pending case that the defendant was not apprised that the Subcommittee demanded his answer. The question is, then, need the indictment contain an allegation that the refusal was wilful? The statute is divided in two parts, the first dealing with a situation where a person duly summoned to appear "wilfully makes default", and the second "or, who having appeared, refuses to answer any question * * *." That there are many circumstances which would vitiate a default in appearance pursuant to a summons, is, of course, quite apparent. Inclusion of the word "wilful" in this part of the statute makes statutory what common

sense would dictate. But having appeared, and refused to answer a question, and having had a further direction to answer, how can a further refusal to answer be said to be anything but wilful? Fields v. United States, 82 U.S. App.D.C. 354, 164 F.2d 97, certiorari denied 332 U.S. 851, 68 S.Ct. 355, 92 L.Ed. 421.

As the Court said in Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 274, 73 L.Ed. 692;

"* * * The gist of the offense is refusal to answer pertinent questions. No moral turpitude is involved. Intentional violation is sufficient to constitute guilt. There was no misapprehension as to what was called for. The refusal to answer was deliberate. The facts sought were pertinent as a matter of law, and section 102 made it appellant's duty to answer. He was bound rightly to construe the statute. His mistaken view of the law is no defense. Armour Packing Co. v. United States, 209 U.S. 56, 85, 28 S.Ct. 428, 52 L.Ed. 681; Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 49, 33 S.Ct. 9, 57 L.Ed. 107."

See also In re Chapman, 166 U.S. 661, 672, 17 S.Ct. 677, 41 L.Ed. 1154.

The indictment in the Sinclair case, supra, concluded with the statement: "'And that said Harry F. Sinclair then and then unlawfully did refuse to answer said question. * * *'" It did not allege a "wilful" refusal.

It is my view that the indictment in the pending case which charged the defendant "unlawfully refused to answer" was sufficient.

In Howenstine v. United States, 9 Cir., 263 F. 1, 3, 4, rehearing denied April 5, 1920, the Court discussed that very contention and said:

"* * * It is the general rule that it is not necessary to charge that the offense was done willfully, unless the statute defining the same

makes willfulness an element thereof; and it is also generally held that words which import an exercise of the will, such as 'feloniously' and 'unlawfully,' will supply the place of the word 'wilfully'." (Citing state cases.)

This, then, is basically the situation here. There is no specific requirement in the statute that the refusal be a wilful one.

In United States v. Altman, D.C., 8 F. Supp. 880, 884, the Court said:

"* * * The indictments charged in part that these defendants 'well knowing the premises aforesaid, *unlawfully* did *knowingly*' act. This amounts to an allegation of unlawful intent. * * * Even though the word 'willful' is omitted in the indictments, allegations of unlawful intent are sufficient." Citing Howenstine v. United States, supra.

The Howenstine case has also been cited with approval as to this point in United States v. Handler, 2 Cir., 142 F. 2d 351, certiorari denied 323 U.S. 741, 65 S.Ct. 40, 89 L.Ed. 594, and Schultz v. United States, 9 Cir., 155 F.2d 721 (distinguished United States v. Valenti, D. C., 74 F.Supp. 719).

From the time of the decision in Sinclair in which the conviction was affirmed and where the indictment did not allege wilfulness but did allege that the defendant "'then and there *unlawfully* did refuse to answer said question'" down to and including the decision in Quinn, the records of this Court indicate that 47 cases have been tried in which the indictments charged violation of § 192 or its forerunner § 102. In all of those cases, the indictments conformed to the language in Sinclair which the indictment in the pending case follows, without in any instance specifying that the refusal to answer was "wilful".

The records further show that in 33 of the 47 cases, the indictments were attacked in the trial court for insufficiency. In every instance the sufficiency of

the indictment was sustained and the motions to dismiss were denied.

I do not understand that the decision in Quinn does or was intended to change the law with respect to the essential allegations of an indictment charging violation of § 192 for, as pointed out heretofore, Quinn refers to matters of proof at trial and not to allegations in the indictment.

■ The defendant is charged in an indictment with a "plain, concise and definite written statement of the essential facts constituting the offense charged." Rule 7(c) Federal Rules of Criminal Procedure, 18 U.S.C. As the Court said in United States v. Josephson, 2 Cir., 165 F.2d 82, 85, certiorari denied 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122:

> "* * * It enabled the appellant to understand the nature of the accusation, gave him the needed information to prepare his defense, and made it possible for him to plead the judgment in bar of another prosecution for the same offense should occasion for doing so arise. That, as we have often held, is enough to make an indictment good."

■ (2) That the indictment is defective for failure to state the authority of the Subcommittee to make this inquiry.

The statute and resolutions of the Senate which established this Subcommittee are recited in the indictment, and they are the evidence the Government proffered to prove that the Subcommittee had power to make this inquiry. Whether the Subcommittee actually had this authority will be dealt with in turn.

(3) That the indictment is defective for the reason that it failed to state the nature of the inquiry. Here again, the Government has stated the authority for the Subcommittee to proceed in this inquiry by citing the statute and resolutions setting up the Subcommittee, and that authority will be fully covered in discussion of further points.

■■ (4) That the indictment is defective because it is vague, and does not give the defendant adequate notice of the crime with which he is charged. Congress has declared itself on the evils and dangers of communism. 18 U.S.C. § 2385 (1940), Internal Security Act of 1950, 50 U.S.C.A. § 781(1). Webster places both noxious and innocuous definitions on the word "conspiracy".[1] Congress having declared communism to be irreconcilable to our system of government, this Court is bound to place the noxious interpretation on the word "conspiracy" as used. And as so used, it is not ambiguous; it describes most appropriately the methods used by promoters of the communist system. It bears mentioning that defendant had no difficulty in understanding what was meant by "communist conspiracy" at the time of the contempt, for he refused to answer the question.

### Point Two.

Defendant contends that the evidence showed that the Subcommittee did not have jurisdiction over the subject under inquiry when he was a witness before it. He bases this claim on (1) history of predecessor committees; (2) the authority of another committee to investigate the matter under inquiry by this Subcommittee; (3) the language of the statute setting up the Committee, from which the Subcommittee derives its power, to wit:

> "(B) studying the operation of Government activities at all levels

1. An agreement between two or more persons to do an evil act in concert; particularly to commit treason, or assassinate a sovereign or statesman or excite sedition or insurrection; any plot, secret combination of men for an evil purpose; as a conspiracy against the government. Crim.Law: a combination between two or more persons to commit any act punishable by law, or to effect a legal purpose by criminal or unlawful means; any striking connivance of persons, classes or agencies; especially a combination to surprise without any evil intent, as a conspiracy of the elements.

with a view to determining its economy and efficiency." 60 Stat. 825.

In view of the extensive changes the Legislative Reorganization Act of 1946 was intended to effect, history of similar prior committees is not compelling. (See Senate Report 1400, 79th Congress, 2nd Session). In that report, the committee said: "They (previous surveys) are agreed that Congress today is neither organized nor equipped to perform adequately its main functions of determining policy, authorizing administrative organization and appropriations to carry out policy, and supervising execution of the resultant programs.

"Devised to handle the simpler tasks of an earlier day, our legislative machinery and procedures * * * must be modernized if we are to avoid an imminent break-down of the legislative branch of the National Government." In view of the intent of Congress to thoroughly revamp our legislative machinery and procedures, the functions prior committees performed can be of no value here.

The defendant contends that another committee had the authority to investigate the matter under inquiry here, and, therefore, the inquiry by this Subcommittee was beyond its authority. While duplicity may not be desired, it does not render such proceedings unlawful. Whether another committee did have such jurisdiction cannot operate to divest this Subcommittee of authority to make the same inquiry, if that authority has been vested in this Subcommittee. Defendant is in no position to complain of the duplicity. United States v. Dennis, D.C., 72 F.Supp. 417.

Defendant's final argument on this point is that the statute which set up the committee created only a budgeting and fiscal committee, not empowered to make the present inquiry. The power of the Committee and its Subcommittee is found both in the statute and in the legislative history of the statute and the Committee. (See Cong. Record 6372, June 6, 1946; 4027, April 25, 1947; 6156, May 20, 1948; 6552–6562, May 27, 1948; Sen. Report 5, 81st Congress, 1st Session, p. 6; 10190, August 7, 1948; 1701–1702, March 3, 1952; 98 Cong. Record, 8811). That this Committee had the power to consider more than budgeting and fiscal matters of government operation is conclusively demonstrated by both the statute setting it up and the legislative history cited. In addition, the Act imposes the duty of studying "efficiency of government activities at all levels" upon the Committee. In examining the efficiency of its programs, Congress can do more than look for waste; it must be able to examine the efficiency of any program in its entirety, to see if it is carrying out the purposes for which it was created, as part of the study of economic efficiency. A program not carrying out its objective can hardly be said to be economically efficient. The avowed purpose of the Information Service was to disseminate information abroad "about the United States, its people, and policies promulgated by the Congress * * *." 22 U.S.C.A. § 1431(1); P.L. 402, 80th Congress. If the operation is efficient, it is carrying out this mandate of Congress. In order to determine its efficiency, it is necessary for Congress to know what policies are being disseminated abroad as those "about the United States, its people, and policies promulgated by Congress". Books were selected as one of the media to carry out this policy. As one of the most direct means of determining if these books are productive of the avowed purpose, Congress has the power to examine the authors of books being used, to determine if those authors were members of the Communist conspiracy at the time they wrote those books.

### Points Three and Four.

As his third and fourth grounds for judgment of acquittal, defendant says that, assuming arguendo the Committee had authority to inquire into the subject at hand, the question was not pertinent; and, if pertinent, that it invaded the defendant's rights under the First Amendment to the Constitution.

Congress has legislated upon the subject of the inquiry, our overseas libraries, and has expended funds for purchase of books for those libraries. As noted above, the avowed purpose of this program, of which the libraries were a part, was to disseminate information abroad "about the United States, its people, and policies promulgated by the Congress * * *." It necessarily follows that if Congress undertakes to investigate the program it initiated, it has the right to know if the ideas being disseminated are truly representative of the avowed purpose. To such an end, it is quite pertinent to know whether, at the time authors wrote books being used in furtherance of the purpose, they were supporting an ideology "antithetical to the principles which underlie the form of government incorporated in the Federal Constitution and guaranteed by it to the States"—communism. Barsky v. United States, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767; Lawson v. United States, 85 U.S.App.D.C. 167, 176 F.2d 49, certiorari denied 339 U.S. 934, 70 S.Ct. 663, 94 L.Ed. 1352; Morford v. United States, 85 U.S.App. D.C. 172, 176 F.2d 54, reversed on other grounds, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815. The question was, as a matter of law, pertinent.

The facts justifying pertinency also justify the abridgment of the defendant's rights under the First Amendment to the Constitution.

 In holding that freedom of speech may be abridged, the Court, in National Maritime Union of America v. Herzog, D.C., 78 F.Supp. 146, 165, affirmed 1948, 334 U.S. 854, 68 S.Ct. 1529, 92 L.Ed. 1776, stated:

"It is fully established by reiterated holdings of the Supreme Court that the right of free speech is not absolute but must yield to national interests justifiably thought to be of larger importance. The same is true of the right to remain silent. When legislating to avert what it believes to be a threat of substantive evil to national welfare, Congress may abridge either freedom. The right to be silent may be interfered with in either of two ways: as an incident to the accomplishment of a legislative purpose, Congress may require an individual to make a statement specifically prescribed by it; or it may require generally that an individual make any statement essential to avert the anticipated evil, without defining the statement."

See also Marshall v. United States, 85 App.D.C. 184, 176 F.2d 473, certiorari denied 339 U.S. 933, 70 S.Ct. 663, 94 L. Ed. 1352; United States v. Bryan, D.C., 72 F.Supp. 58; United States v. Eisler, D.C., 75 F.Supp. 640, affirmed 84 U.S. App.D.C. 404, 176 F.2d 21; United States v. Fitzpatrick, D.C., 96 F.Supp. 491; Barsky v. United States, supra; Morford v. United States, supra; Lawson v. United States, supra.

### Conclusion.

The motion of the defendant for judgment of acquittal will be denied.